## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
)
PATRA, LLC, &                             )
ILIAS GIANNAKOPOULOS,                      )
    Plaintiffs,                            )
                             )    Docket No. 1:05-cv-11471
    v.                                     )
                             )
MOTIVA ENTERPRISES, LLC, &                 )
STEVE L. SANTORO,                          )
    Defendants.                            )
_____)

## <u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS, WITH PREJUDICE, COUNTS V and VIII OF PLAINTIFFS' COMPLAINT, OR IN THE ALTERNATIVE, FOR JUDGMENT ON THE PLEADINGS AS TO THOSE COUNTS ONLY</u>

Pursuant to F.R.C.P. 12(b)(6), defendants Motiva Enterprises, LLC ("Motiva") and its local real estate consultant, Steve L. Santoro ("Santoro") (collectively "Defendants"), hereby move to dismiss Count V (breach of fiduciary duty) and Count VIII (class action) of the Complaint. In the alternative, Defendants move for judgment on the pleadings as to these counts pursuant to F.R.C.P. 12(c) and 12(h)(2).

Plaintiffs, an individual service station dealer and his limited liability corporation (collectively, "Giannakopoulos"), allege that they were harmed when Motiva refused to sell them the gasoline station premises that Giannakopoulos currently leases at 1241 Boylston Street in Boston (the "Premises"). Complaint ¶¶ 8, 9, 17, and Counts I through XI. Specifically, Giannakopoulos contends that he submitted a written offer to buy the Premises using a form that Motiva provided—the "Retailer Offer to Purchase Premises"

(the "Retailer Offer")[1]—and that Santoro told him that the offer was sure to be approved and that Motiva would sell him the Premises for $2.3 million. Giannakopoulos contends that Motiva's subsequent failure to sell him the Premises constituted a breach of contract, a breach of the covenant of good faith and fair dealing, promissory estoppel, a breach of fiduciary duty, misrepresentation, and a violation of both the Petroleum Marketing Practices Act and M.G.L. c. 93A, for which he claims a right to specific performance and damages. Complaint ¶ 1, and Prayers for Relief. Giannakopoulos further contends that Santoro's actions in connection with the transaction constituted fraudulent misrepresentation, a violation of Chapter 93A, and intentional infliction of emotional distress. Complaint ¶ 2. Lastly, Count VIII seeks to establish this matter as a class action.

Because Giannakopoulos has not alleged sufficient facts to sustain Counts V (fiduciary duty) and VIII (class action), Defendants hereby move to dismiss these counts with prejudice, or in the alternative, request that judgment on the pleadings as to these counts be allowed.

I.     **Giannakopoulos Has Failed to Allege Facts Supporting the Existence of a Fiduciary Relationship in This Purely Commercial Transaction.**

A.     Under Massachusetts law, special circumstances are needed to create a fiduciary duty in an ordinary commercial transaction.

Under Massachusetts law, a "fiduciary" is "a person having a duty, created by his undertaking, to act principally for the benefit of another in matters connected with that undertaking." *Doe v. Harbor Schools, Inc.*, 63 Mass. App. Ct. 337, 346 (2005). The law

---

[1] A true and correct copy of the Retailer Offer (exclusive of unsigned addenda and exhibits) containing all relevant language and executed by Giannakopoulos as Manager of Patra, LLC, but not executed by Motiva, is attached hereto as Exhibit A. Defendants will promptly supplement Exhibit A to include its addenda and exhibits should the Court request the same.

recognizes certain relationships as inherently fiduciary in nature, such as lawyer/client, trustee/beneficiary, director/corporation, and guardian/ward. By contrast, relationships in a commercial transaction are not presumed to be fiduciary in nature and will only support a claim for breach of fiduciary duty if facts are pled supporting the existence of a unique relationship. *See Doe v. Harbor Schools, Inc.*, 63 Mass. App. Ct. 337, 346 (2005); *Davidson v. General Motors Corp.*, 57 Mass. App. Ct. 637, 642-43, 845-50 (2002). A purely commercial transaction does not give rise to a fiduciary relationship. *Salinsky v. Perma-Home Corp.,* 15 Mass. App. Ct. 193, 197 (1983) (finding no fiduciary relationship between aluminum siding seller and individual buyer); *Patsos v. First Albany Corp.*, 433 Mass. 323, 330 (Mass. 2001) ("a 'simple' broker-customer relationship is not fiduciary in nature, even if a broker has encouraged the trust of an unsophisticated customer"). In the commercial setting, to establish the existence of a fiduciary relationship, plaintiffs must plead and prove that "the relationship was one of trust and confidence; that the plaintiffs relied upon the specialized knowledge or judgment of [the defendants] and that [the defendants were] aware of the plaintiffs' reliance." *Davidson*, 57 Mass. App. Ct. at 643.

However, "[a] business relationship is not transformed into a fiduciary relationship merely because trust was reposed by one party in the other party." *Id.*; see *also Broomfield v. Kosow*, 349 Mass. 749, 755 (Mass. 1965) ("the plaintiff alone, by reposing trust and confidence in the defendant, cannot thereby transform a business relationship into one which is fiduciary in nature"). Rather, the plaintiff must plead and prove that "the circumstances surrounding the relationship would lead a reasonable person to believe that he or she could confide in, or rely on, the other for a particular purpose." *Doe*, 63 Mass. App. Ct. at 347. Because the essence of the fiduciary

relationship is a reasonable belief that one person is acting principally for the other's interest, where "the plaintiffs knew that [the defendant] was acting to protect and advance its own interest," there can be no claim for breach of fiduciary duty. *Davidson*, 57 Mass. App. Ct. at 642-43.

      B.    <u>The Complaint does not allege a relationship of trust and confidence</u>.

Here, Giannakopoulos' Complaint alleges no facts sufficient to support the existence of a fiduciary duty. Rather, the Complaint alleges facts demonstrating that the parties were engaged in a multi-million dollar, arm's-length real estate negotiation in which Giannakopoulos was represented by his own experts and lawyers. On the facts alleged, Giannakopoulos cannot maintain that he—and the lawyers of his own choosing—were reasonably relying on Defendants to act in his best interest during this adverse negotiation. Accordingly, the Complaint states no claim for breach of fiduciary duty.

Rather than alleging facts showing that Defendants were acting as fiduciaries in Giannakopoulos' interest, the Complaint alleges facts showing a routine, arm's-length real estate negotiation between a franchisor and franchisee over a business premises. As alleged in the Complaint, Giannakopoulos has been a gasoline station dealer and franchisee of Motiva or its predecessors for 33 years and has operated at the Premises since 1978. Complaint ¶ 8. The Complaint suggests that Giannakopoulos is experienced in the local real estate market since he claims he was negotiating to buy the property adjacent to the Premises. Complaint ¶ 13. Further, Giannakopoulos offered Motiva $2.3 million to buy the Premises, arranged for bank financing, put up a 10% deposit, hired environmental experts to review the site reports, and retained a lawyer to advise him in

connection with the Retailer Offer document that he submitted to Motiva. *See* Complaint ¶ 17.[2] During the negotiations, Giannakopoulos dealt primarily with Santoro, a Motiva employee who was the company's local real estate consultant. Complaint ¶¶ 13-19.

Quite simply, these facts allege no "special relationship" in which Giannakopoulos, an experienced businessman familiar with the local real estate market, could reasonably believe that Motiva and Santoro had undertaken to act on his behalf. There is simply no way that a commercial tenant/franchisee who was represented by counsel could reasonably have been confiding in or relying on his landlord/franchisor during a major real estate negotiation over the purchase of an expensive piece of real estate.

The facts alleged here are very similar to those presented in *Davidson*, *supra*, where the Massachusetts Appeals Court held no fiduciary relationship to exist. The plaintiffs in *Davidson* were entrepreneurs who had been the long-term owners of a General Motors auto dealership. *Davidson*, 57 Mass. App. Ct. at 638. During a series of negotiations, a GM representative persuaded the plaintiffs to forego investing in a particular new GM dealership and rather to invest in a different one. *Id.* at 639. When certain information supplied by the GM representative turned out to be wrong, the plaintiffs claimed that GM (through the representative) had "breached a fiduciary duty to them by providing them with misleading, incomplete and inadequate information on which they relied in making their decision to invest in the … dealership." *Id.* at 641. Rejecting this contention, the court held that a "business relationship is not transformed into a fiduciary relationship merely because trust was reposed by one party in the other

---

[2] The Retailer Offer at ¶ 20 shows that if formal notice was required, it was to be made to, among others, "Purchaser's Attorney", Robert Levy, who is also plaintiffs' attorney in this case.

5

party." *Id.* at 643.  Even assuming that the plaintiffs had relied on the information from the GM employee, the court noted that plaintiffs were represented by counsel and had executed legal documents making clear that GM was negotiating in its own interest, not protecting plaintiffs' interests.  *Id*. at 641-42.

Like the plaintiffs in *Davidson*, Giannakopoulos was represented by counsel in connection with the negotiation and submission of the Retailer Offer document.[3] Moreover, the Retailer Offer itself expressly provides that "Motiva has the right not to accept this Offer for any reason whatsoever."[4]  Based on these facts, there is no way that Giannakopoulos can establish he was reasonably relying on Defendants to act in his interests, rather than in Motiva's interest, in connection with his proposed purchase of the Premises.  Accordingly, Giannakopoulos has not alleged the existence of a fiduciary relationship, and Count V should be dismissed.

## II.     Plaintiffs' Putative Class Claim Should Be Dismissed Because Plaintiffs Have Not Even Alleged the Existence of a Coherent Class, Much Less the Other Elements Necessary for a Class Action.

Separately, Giannakopoulos' Complaint purports to state a claim on behalf of a putative class of dealers who "have dealt with" Motiva and have "entered into and been presented with" a Retailer Offer document like the one Giannakopoulos signed, or "have been constructively barred from selling" gasoline.  Complaint ¶¶ 53-54.  However, the Complaint contains no factual allegations that could convert Giannakopoulos' individualized claim over the outcome of a particular real estate negotiation into any classwide claim.

---

[3]     *See* Ex. A at 12.

[4]     Ex. A, ¶ 1.

Other than conclusory boilerplate,[5] the Complaint makes no allegation that Motiva has engaged in any pattern of wrongdoing or common course of conduct with respect to any identifiable class of its service station dealers. The Complaint identifies no group of dealers who are aggrieved in any common way by the unspecified "unconscionable conditions" contained in the Retailer Offer form—and, indeed, the suggestion that this contract form is unconscionable on a classwide basis is squarely at odds with Giannakopoulos' individualized claim to enforce the contract in his case through an order of specific performance. Moreover, there is no competent allegation that Giannakopoulos—who remains in operation of his station to this day—has been "constructively barred" from selling gasoline or has been coerced into shutting down, much less than any specific dealer or group of dealers has suffered such treatment.

The Complaint's class action allegations are a transparent attempt to increase the settlement value of the case by turning it into something more than what it is: a routine contract case over a single failed negotiation. Because the purported class action claim is unsupported by any concrete factual allegations and is at odds with the specific claims asserted on behalf of Giannakopoulos, the class claims in the Complaint should be dismissed as a matter of law. *Smilow v. Southwestern Bell*, 323 F.3d 32, 38 (1st Cir. 2003).

Moreover, on its face, a putative class of dealers who have "entered into and been presented with" a Retailer Offer form would be too diverse to be maintainable under the standards of Rule 23. Some members of the putative class will have consummated a deal with Motiva and bought their station premises long ago; others will have signed the Retailer Offer, but then failed to obtain the financing they needed to buy their station

---

[5] Complaint ¶ 58.

7

premises; others will have been presented with the Retailer Offer form and decided not to proceed with the purchase because they did not agree with the provisions; still others will have changed their minds about purchasing the premises for unrelated reasons; finally, there may be instances where Motiva declines the dealer's offer entirely (very few of which result in a breach of the Retailer Offer and consequent payment of liquidated damages).[6]   Because, on its face, the proposed class is an incoherent amalgamation of dealers and former dealers in vastly different circumstances, the class action allegations should be dismissed at this early stage.

Finally, plaintiffs seeking to certify a class in federal court must demonstrate the four elements of Rule 23(a):  numerosity, commonality, typicality, and adequacy.   In addition, they must satisfy the requirements of Rule 23(b), subpart 1, 2, or 3.  *Id.*   Here, Giannakopoulos clearly is seeking certification under subpart 3, which requires a further showing of predominance and superiority.[7]     Complaint   ¶¶ 57-58.   Because Giannakopoulos' amorphous class claim both makes no sense and is at odds with his own individual claims, the Complaint does not adequately allege any of the required procedural elements to proceed as a class action—particularly commonality, typicality, or adequacy.  Therefore, Count VII should be dismissed.  *See Smilow*, *supra*.

---

[6] Ex. A, ¶ 19.

[7] Notwithstanding the fact that this action was originally filed pursuant to M.R.C.P. 23, the language of the complaint reflects an intention to certify the class on these bases, which is consistent with the requirements of F.R.C.P. 23(b)(3).

## **CONCLUSION**

For the foregoing reasons, defendants Motiva Enterprises, LLC and Steve L. Santoro request that this Court dismiss Count V and Count XIII of the plaintiffs' complaint against all defendants, with prejudice, or in the alternative, allow judgment on the pleadings as to these counts.


                              Respectfully submitted,

Dated: August 22, 2005        **MOTIVA ENTERPRISES, LLC. and**
                              **STEVE L. SANTORO**
                              By Their Attorneys,


                              _/s/ Anne-Marie Gerber_____
                              William L. Parker, BBO# 549839
                              Amy Cashore Mariani, BBO # 630160
                              Anne-Marie Gerber, BBO# 649337
                              **FITZHUGH, PARKER, & ALVARO, LLP**
                              155 Federal Street, Suite 1700
                              Boston, MA 02110-1727
                              (617) 695-2330

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 22nd, 2005, I have served the above document upon all counsel of record as follows.

Erik J. Frick, Esq.
Eckert Seamans Cherin & Mellott, LLC
One International Place, 18th Floor
Boston, MA 02110


  /s/ Melissa Wangenheim
Melissa Wangenheim

## RETAILER OFFER TO PURCHASE PREMISES

**Cost Center Number:**    100003
**Site or Station Location:**    1241 Boylston Street
                                   Boston, MA 02215-3501

      Patra, LLC. A Massachusetts limited liability company, with an address of 1241 Boylston Street, Boston, Massachusetts 02215-3501, ("Purchaser"), offers to purchase from MOTIVA ENTERPRISES LLC, a Delaware limited liability company, with offices at 12700 Northborough, Suite 100, Houston, TX ("Motiva") (Purchaser and Motiva being collectively referred to herein as the "Parties") certain real property consisting of land and any buildings, fixtures and improvements erected or attached thereon or thereunder as described in Exhibit A attached hereto and also the personal property and equipment described in Exhibit B attached hereto (collectively "Premises"), all on the following terms and conditions:

      **1. MOTIVA'S ACCEPTANCE.** Purchaser offers this offer (the "Offer") in triplicate. Motiva may accept this Offer by executing it and obtaining its execution also by Adelson Loria & Weisman P. C., ATTN: Martin A. Loria, Esquire, 617-330-1625 (phone), with offices at One International Place, 11th Floor, Boston, Massachusetts 02110 ("Escrow Attorney"), and by Escrow Attorney returning an executed counterpart to Purchaser not later than forty-five (45) days after Purchaser's execution, together with a title commitment, either by personal delivery to Purchaser or by depositing it in the mail (certified or registered) or with an air courier (charges prepaid) with confirmation of delivery requested. Escrow Attorney shall then give Motiva notice of the date on which such counterpart was either personally delivered to Purchaser or deposited in the mail or sent by air courier ("Return Date"). Motiva has the right not to accept this Offer for any reason whatsoever, and Purchaser waives and releases Motiva from all claims from any such non-acceptance of this Offer and from Motiva's acceptance of other offers for the sale of the Premises.

      **2. PREMISES DESCRIPTION.** The description of the land is set out in Exhibit A, attached. Motiva may, at its option, on the deed and all other instruments, substitute a more complete, accurate or current description of the land for the description on Exhibit A. The description of the equipment to be included in this transaction is set out in the Bill of Sale, attached as Exhibit B. The equipment listed on Exhibit B shall be the only equipment included in the term "Premises." All other equipment not specifically listed on Exhibit B shall not be sold pursuant to this Offer and may be removed from the Premises as provided herein.

      It is expressly understood that the interest in the Premises is the fee simple interest.

      **3. CONVEYANCE.** The conveyance of the Premises shall be by a deed as attached in Exhibit A-1, delivered at Closing upon payment of the Purchase Price (as defined below). "Close" or "Closing" shall mean Purchaser's execution, notarization and delivery to Escrow Attorney of all documents required by this Offer and Escrow Attorney and the delivery to Escrow Attorney by Purchaser of the balance of all funds due herein by cashier's check, certified check or wired funds ("Good Funds"). Title to the equipment

shall be transferred by Bill of Sale as shown in Exhibit B attached. Conveyance shall be subject to the following:

"Encroachments, protrusions, easements, changes in street lines, rights-of-way and other matters that would be revealed by a current, on-the-ground survey and inspection of the Premises."

"Recorded leases, agreements, easements, rights-of-way, covenants, conditions and restrictions as the same may be of present force and effect." Provided that none of the foregoing shall materially interfere with the use of the Premises as a motor fuel dispensing station or automotive service station.

"Zoning regulations, ordinances, building restrictions, regulations and any violations thereof."

"The lien for real property taxes for the current year, and any liens for special assessments which, as of the date of Closing, are not due and payable."

A 10 year Brand Covenant as referenced in the Addendum to Retailer Offer to Purchase Premises attached hereto.

Title to the Premises shall be conveyed to Purchaser as follows: Patra, LLC or nominee, provided said nominee is controlled by Ilias and/or Kostadinos Gianakopoulos.

**4. PURCHASE PRICE AND EARNEST PAYMENT**. The total purchase price to be paid by Purchaser for the Premises is $2,300,000 ("Purchase Price"), of which $1,700,000 is for land, $400,000 is for improvements and $200,000 is for the equipment which includes $100,000 for the UST System (listed on Exhibit B), which consideration shall be paid as hereinafter provided. Upon Purchaser's execution of this Offer, Purchaser shall deposit with Motiva the sum of $230,000 (10% of the Purchase Price), as earnest money, in the form of a cashier's check or other Good Funds payable to the order of Adelson Loria & Weisman P. C., which is non-interest bearing to the Purchaser (the "Earnest Payment"). The date Purchaser deposits the Earnest Payment shall be the "Deposit Date." Purchaser's failure to deposit the Earnest Payment with Motiva upon execution of this Offer shall be deemed an act of default by Purchaser, whereupon this Offer shall automatically terminate without further notice, demand or opportunity to cure. The balance of the Purchase Price is due at Closing by delivery of Good Funds to Escrow Attorney. Purchaser understands that neither the acceptance of the Earnest Payment by Motiva or Escrow Attorney nor any receipt given to Purchaser with respect to the Earnest Payment constitutes acceptance of this Offer by Motiva.

**5. TIME OF CLOSING**. The closing shall be within thirty (30) days after all due diligence periods, including without limitation, the periods set forth in Section 17 hereof, under this Offer have passed, or earlier if agreed to by the Parties hereto. Time is of the essence. Once all due diligence periods under this Offer have passed, Motiva shall establish a specific date for Closing ("Closing Date") and shall provide Purchaser at least seven (7) days written notice of that date. Closing shall not be extended beyond the Closing Date except as provided in this Offer. In the event that the Purchaser fails to Close on the Closing Date, Motiva has the right, but not the obligation, to terminate this Offer without any further obligation or liability to Purchaser resulting from this Offer with

the exception of those rights, obligations or liabilities under those provisions of this Offer that survive termination of this Offer. Purchaser's failure to Close on the Closing Date shall be deemed an act of default by Purchaser, whereupon the Earnest Payment shall be retained by Motiva.

6. **PLACE OF CLOSING**. The Closing shall be at the offices of Escrow Attorney at its address specified herein or its agent at an alternative location as agreed to by the Parties.

7. **ENVIRONMENTAL**.

**Disclosure**. Tanks, piping, leak detection devices, and related equipment used for the storage and dispensing of petroleum products, used oil and/or heating oil and other equipment related to the operation of a motor fuel service station were, are or may be present on the Premises (the "UST System"). Motiva makes no warranty or representation that the UST System, if present, is fit for any use whatsoever, or that it is free of petroleum hydrocarbons, oil, nonmerchantable petroleum residue or hazardous substances.

**Environmental Testing**.

By Motiva. Motiva shall provide Purchaser with a copy of Motiva's environmental assessment report(s) (referred to as "Motiva's Environmental Reports") for the Premises as listed on Exhibit F attached hereto and made a part hereof. The date of Purchaser's receipt of Motiva's Environmental Reports shall be referred to hereinafter as the "Report Date." Motiva makes no warranty or representation as to the accuracy or completeness of said report(s). Within thirty (30) days of the later of the Report Date or Return Date, either party may terminate this Offer by providing notice to the other party and Escrow Attorney that termination is due solely to the Premises' environmental condition as described in either Motiva's Environmental Reports or other environmental reports indicating that environmental conditions on property adjacent to the Premises may have an adverse impact on the Premises. Upon receipt of notice of termination, provided Purchaser is not otherwise in default under this Offer, Motiva shall promptly refund to Purchaser the Earnest Payment, and neither party shall have any further obligations or liabilities to the other party resulting from this Offer, with the exception of obligations or liabilities under those provisions of this Offer that survive any termination of this Offer.

By Purchaser. Within fifteen (15) days of the later of Report Date or Delivery Date, Purchaser shall notify Motiva if Purchaser intends to enter the Premises to inspect, survey or conduct such testing as Purchaser may desire, whether for potential contamination in the surface or subsurface of the Premises or otherwise (hereinafter referred to as "Testing"). Purchaser may enter the Premises to conduct Testing upon prior consent by Motiva for these Premises and subject to the following conditions: (a) any contractor, consultant or agent used by Purchaser for the Testing shall be, in the sole discretion of Motiva, acceptable to Motiva; however, the Testing shall be at Purchaser's sole cost; (b) Motiva shall have the right to observe the Testing and to take split samples; (c) Purchaser shall indemnify, defend and hold Motiva, and its members, officers, employees, subsidiaries and affiliates, harmless from any and all damages (including damage to the Premises), losses, claims, liabilities, penalties, costs

and expenses (including attorney's fees) resulting from acts or omissions associated with the Testing, and this covenant shall survive the Closing or earlier termination of this Offer; (d) Purchaser agrees to obtain the insurance specified in Article 7.3; and (e) the Testing and subsequent generation of a survey, quality-assured laboratory data, and other written report(s), if any, (hereinafter referred to as "Testing Results") shall be completed within forty-five (45) days of the later of Report Date or Delivery Date. Upon completion of the Testing of the Premises and the subsequent generation of Testing Results, Purchaser shall provide the Testing Results to Motiva within five (5) business days. Within fifteen (15) business days of Motiva's receipt of the Testing Results, either party may terminate this Offer by providing notice to the other party and Escrow Attorney that termination is due solely to the Premises' environmental condition as described in Purchaser's Testing or other environmental reports indicating that environmental conditions on property adjacent to the Premises may have an adverse impact on the Premises. Upon notice of termination, provided Purchaser is not otherwise in default under this Offer, Motiva shall promptly refund to Purchaser the Earnest Payment, and neither party shall have any further obligations or liabilities to the other party resulting from this Offer, with the exception of obligations or liabilities under those provisions of this Offer that survive any termination of this Offer.

**Testing Insurance**. If Purchaser conducts Testing as outlined in Article 7.2.2 above, Purchaser shall maintain, at Purchaser's sole cost, or shall require any contractor, consultant or agent Purchaser may engage to maintain, at all times as required in this Offer, the insurance coverage set forth below with providers satisfactory to Motiva with full policy limits applying, but not less than as set forth below. A certificate naming Motiva, and its members, officers, employees, subsidiaries and affiliates, as additional insureds and referencing the indemnification provisions set forth in this Offer shall be delivered to Motiva prior to commencement of the Testing. Such certificate shall provide that any change restricting or reducing coverage or the cancellation of any policies under which certificates are issued shall not be valid as respects Motiva's, or its members', officers', employees', subsidiaries' and affiliates', interest herein until Motiva has received thirty (30) days prior notice in writing of such change or cancellation.

Worker's Compensation Insurance as required by laws and regulations applicable to and covering employees of Purchaser, its contractors, consultants or agents engaged in the performance of the Testing.

Employer's Liability Insurance protecting Purchaser against common law liability, in the absence of statutory liability, for employee bodily injury arising out of the master-servant relationship with a limit of not less than Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00) each occurrence.

Comprehensive General Liability Insurance including products / completed operations with limits of liability of not less than One Million and No/100 Dollars ($1,000,000.00) combined single limit. This policy shall cover, among other risks, the contractual liability assumed under the indemnity provision set forth in this Offer.

Business Automobile Liability Insurance covering all vehicles used in the operations of Purchaser with limits of liability of not less than Seven Hundred Fifty Thousand and No/100 Dollars ($750,000.00) combined single limit.

**Environmental Insurance**. If Purchaser purchases the UST System, Purchaser must purchase and maintain the environmental insurance referenced in this Article 7.4. Motiva is not obligated to close the transaction contemplated by this Offer if Purchaser has not purchased the environmental insurance policy by the closing and provided evidence of insurance to Motiva. Purchaser shall, at Purchaser's sole cost, maintain Underground Storage Tank Liability Insurance with annual limits of not less than $1,000,000 each occurrence and $2,000,000 general aggregate with providers satisfactory to Motiva with full policy limits applying, but not less than as required herein, for a period that commences on the Closing Date and ends on UST System removal by any person (the "Period"). Said insurance will provide, at a minimum, coverage for on- and off-site remediation, on- and off-site third party bodily injury and property damage and legal defense. This insurance shall: (1) provide a waiver of subrogation in favor of Motiva where permissible by law; (2) be primary insurance underlying any other insurance available to Motiva; and (3) give Motiva thirty (30) days written notice of cancellation or material change. Any deductible or retention of insurable risks shall be for Purchaser's account. Purchaser shall obtain a one (1) year policy and provide a certificate of insurance evidencing the required insurance is in effect prior to closing and within ten days prior to each subsequent annual anniversary of the Closing Date. Purchaser's obligations under this Article 7.4 shall survive the closing. If at any time after the Closing Date Purchaser fails to maintain the insurance required by this Article 7.4, Motiva is entitled to pursue any or all of the following remedies: (a) cure Purchaser's default under this Article 7.4, after which Purchaser shall immediately reimburse Motiva for all costs and expenses (including, but not limited to insurance premiums and attorneys fees); (b) access the Premises and remove the UST System, after which Purchaser shall immediately reimburse Motiva for all costs and expenses incurred by Motiva; (c) seek specific performance from Purchaser with respect to Purchaser's default under this Article 7.4, and (d) pursue Purchaser for all remedies available at law or in equity for costs, expenses, losses, and damages incurred by Motiva with respect to Purchaser's default under this Article 7.4. Purchaser hereby agrees to use its best efforts to cooperate with Motiva with respect to any remedy Motiva pursues under this Article 7.4. Without limiting the generality of the foregoing Purchaser's cooperation shall include, but not be limited to, granting Motiva access to the Premises to remove the UST System. The parties agree that no provisions of this Offer void, alter or limit Motiva's rights to pursue the aforementioned remedies.

**UST System Testing**. At least fifteen (15) days prior to the Closing Date, Motiva, at its expense, shall cause the UST System to be tested by a third party-certified precision testing method recognized in the industry as being reliable. In the absence of a third party-certified precision testing method, the UST System's secondary containment systems that are tested will be tested using a method specified in an applicable manufacturer's guideline, an industry code or a generally recognized engineering standard. If Motiva cannot reasonably determine the existence of an applicable manufacturer's guideline, industry code, or generally recognized engineering standard, Motiva shall cause a test method to be used that is approved by a state-registered professional engineer. Motiva makes no representation or warranty as to the accuracy or completeness of any test or report generated by this testing. Purchaser will acknowledge receipt of this report at closing by executing Exhibit D, attached hereto. If Purchaser is in possession of the Premises prior to the Closing Date, Purchaser agrees to give Motiva and its designees access to the Premises, and Purchaser further agrees to take all actions necessary, at Purchaser's expense, to permit completion of the UST System

testing (including but not limited to delivery of adequate quantities of appropriate motor fuels and other products (as determined by the test method selected) and the cessation of motor fuel sales necessary during the pendency of the testing). If the testing by Motiva indicates a deficiency in any part of the UST System, and the total cost to repair and retest the deficiency does not exceed $10,000, Motiva shall, at its sole expense, repair the deficiency in the UST System and retest the repaired UST System. If any testing by Motiva of the UST System indicates a deficiency in any part of the UST System, and the total cost to repair and retest the deficiency exceeds $10,000, Motiva shall so notify Purchaser and shall provide Purchaser an estimate for any activities determined by Motiva to be necessary (the "Work") from a contractor selected by Motiva ("Contractor"). Motiva shall remove the UST System unless Purchaser provides written notice within ten (10) days from receipt of Motiva's notice to have the Work completed by Contractor as estimated (where the amount of such estimated shall be irrebuttably presumed to be reasonable and not subject to challenge by Purchaser) and to deposit with Motiva an amount equal to Contractor's estimate less $10,000 in the form of a cashier's check payable to the order of Motiva which is non-interest bearing to Purchaser (whether the initial payment or as supplemented as provided hereinafter, the "Repair Payment"). Nothing herein to the contrary, in no event shall the Repair Payment be refundable to Purchaser once Contractor begins the Work. If either a) after the Work is performed, deficiencies remain in the UST System that cannot be repaired to the satisfaction of Motiva and any relevant governmental agency having jurisdiction (the "Agency"), if required by applicable law, or b) Motiva notifies Purchaser of its intent to remove the UST System, then Purchaser will have seventy-two (72) hours in which to give Motiva notice that Purchaser elects to terminate this Offer, in which event Motiva shall promptly refund to Purchaser the Earnest Payment paid by Purchaser and neither party shall have any further obligations or liabilities to the other party resulting from this Offer, with the exception of obligations or liabilities of this Offer that survive any termination of this Offer. If Motiva removes the UST System, the Purchase Price shall be reduced by the UST System amount specified in Article 4. If the UST System activities specified in this Article are not completed by the Closing Date, Motiva may delay closing until the activities are completed. If the cost of the Work exceeds the Repair Payment, Purchaser shall deposit with Motiva within ten (10) days after receipt of the final invoice for the Work but no later than the Closing Date, an amount equal to the total cost of the Work and the Repair Payment. If the cost of the Work was less than the Repair Payment, Motiva shall reimburse Purchaser within ten (10) days after receipt of the final invoice for the Work but no later than the Closing Date. Motiva shall have no liability for business interruption or any other losses incurred by Purchaser due to any UST System testing, repairs, upgrades or removal. If any underground storage tank has been previously lined or repaired, the Agency may not allow any additional repairs.

   **UST System**. The UST System included in the sale is listed on Exhibit B attached hereto. Motiva makes no warranty or representation that the UST System is fit for any use whatsoever, or that it is free of petroleum hydrocarbons, oil, nonmerchantable petroleum residue or hazardous substances. Purchaser shall execute a "Notice of Tank Owner's Notification Obligations", attached as Exhibit E on the Closing Date.

   **Environmental Reports**. If neither party terminates this Offer pursuant to Article 7.2, then Motiva's Environmental Reports and the Purchaser's Testing Results (if any) shall be listed on Exhibit F attached hereto and made a part hereof.

**8. INSPECTION**. Purchaser represents that Purchaser (or its agents or consultants) will have inspected, by the Closing Date, the Premises, together with the equipment included in this sale, will be familiar with its condition, inclusive of petroleum hydrocarbons and other substances in the soil or groundwater that may or may not be present, and accepts same AS IS, AND WITHOUT ANY EXPRESS OR IMPLIED WARRANTIES OR REPRESENTATIONS ON THE PART OF Motiva as to what that condition may be, except as expressly set forth in this Offer and its exhibits. Purchaser further represents that Purchaser has determined that all equipment listed on the attached Exhibit B exists and is present on the Premises.

**9. REMEDIATION AND ACCESS**.

Purchaser acknowledges that there are or may be petroleum hydrocarbons (gasoline and its constituents, oil, etc., in liquid, dissolved or vapor form) or other substances on, under or migrating from or onto the Premises. Purchaser agrees that on the Closing Date, Purchaser will execute in the presence of a Notary Public an Access Agreement, which shall be recorded in the real property records together with the deed. The Access Agreement is attached as Exhibit G. The Access Agreement grants on behalf of Purchaser, its heirs, successors and assigns, permission to Motiva, its employees, authorized agents and contractors, and any Agency to enter the Premises (including any building and facilities located thereon) to conduct Corrective Action of any environmental condition caused or created on or about the Premises by the use and occupancy of the Premises by Motiva, Shell Oil Company or Texaco Refining and Marketing Inc. prior to the Closing Date ("Motiva's Corrective Action"). It is agreed that Motiva's Corrective Action shall be performed by Motiva at Motiva's expense. Purchaser agrees that Motiva is under no obligation to Purchaser to perform Corrective Action with respect to any environmental condition caused or created on or about the Premises on and after the Closing Date, nor is Motiva obligated to perform Corrective Action with respect to any substance that in the past migrated or in the future migrates onto the Premises from property other than the Premises, nor is Motiva under any obligation to Purchaser to perform Corrective Action with respect to Corrective Action that is not Motiva's Corrective Action. Electricity for the operation of Motiva's Corrective Action equipment, if any, shall be metered separately from the building electricity and billed separately to Motiva.

Purchaser agrees to perform or have performed, at Purchaser's sole expense, Corrective Action with respect to (a) any environmental condition caused or created on or about the Premises on and after the Closing Date, which conditions shall be determined by reference to the Environmental Reports listed on Exhibit F; (b) any environmental condition of the Premises caused or created at any time, whether prior to the Closing Date or otherwise, to the extent that said condition results from migration of any substances from property other than the Premises; and (c) any Corrective Action that is not Motiva's Corrective Action (collectively, "Purchaser's Corrective Action"). Purchaser agrees to comply with all existing and future applicable laws and regulations pertaining to the existing or any new UST System or any other equipment or operations on the Premises, including but not limited to those requiring insurance, inventory records, leak detection devices, system inspections, tank and line tests, tank field monitoring well tests, release reporting and document retention. Purchaser further agrees to provide Motiva, within fifteen (15) days of the date request is made by Motiva, with any copies of any records pertaining to the above or any other records required by

applicable law to be kept with respect to any operations conducted on the Premises. Further, upon notice by Motiva, Purchaser shall make available for review by Motiva at the Premises during normal business hours all records required by applicable law.

Purchaser acknowledges and agrees that Motiva shall perform Corrective Action consistent only with commercial, industrial, or similar non-residential assessment or cleanup standards established by the Agency.

### 10. INDEMNIFICATION.

**Motiva's Indemnification**. From and after the Closing Date, Motiva agrees to indemnify, defend and hold harmless Purchaser from and against all demands, claims, causes of actions, losses, damages, liabilities, penalties, costs and expenses (including attorney's fees) (collectively, "Purchaser's Losses") arising from (a) personal injuries to, disease or death of, third parties caused by Motiva's acts or failures to act with respect to the Premises prior to the Closing Date; or (b) Motiva's acts or failures to act related to the performance of Motiva's Corrective Action, whether or not the matters subject to this indemnity arise or are caused by the sole negligence, concurrent negligence, gross negligence or intentional conduct of any person (excluding Purchaser), or strict operation of law without regard to fault. However, Motiva's indemnity shall not cover Purchaser's Losses arising from (a) any matters caused by or arising from migration of contaminants from property other than the Premises, whether said migration occurred prior to the Closing Date or occurs after the Closing Date; (b) contamination of the Premises that is not subject to Motiva's Corrective Action; or (c) the condition of the Premises or the equipment as of the Closing Date, it being understood that Purchaser is purchasing the Premises and the equipment on an AS IS BASIS, AND WITHOUT ANY EXPRESS OR IMPLIED WARRANTIES OR REPRESENTATIONS ON THE PART OF MOTIVA as to what that condition may be, except as expressly set forth in this Offer and its exhibits. The indemnity set forth herein shall also run to any bank or financial institution to which Purchaser may grant a purchase money security interest to secure a loan to pay all or a part of the Purchase Price. Motiva's indemnity shall survive the closing, but shall terminate when Motiva's Corrective Action is complete as determined according to the Access Agreement as seen in Exhibit G attached hereto.

**Purchaser's Indemnification**. From and after the Closing Date, the Purchaser agrees to indemnify, defend and hold harmless Motiva, its members, predecessors, subsidiaries, affiliates, officers, directors, employees, agents, and each of their predecessors, successors, heirs and assigns, from and against any and all demands, claims, causes of action, losses, damages, liabilities (including without limitation all environmental liabilities), penalties, costs and expenses (including attorney's fees) (collectively, "Motiva's Losses") arising from acts, failures to act or conditions with respect to the Premises which occurred or were caused on or after the Closing Date, including without limitation, matters related to Purchaser's Corrective Action, whether or not the matters subject to this indemnity arise or are caused by the sole negligence, concurrent negligence, gross negligence or intentional conduct of any person, or strict operation of law without regard to fault. Purchaser's indemnification obligations shall cover Motiva's Losses arising from (a) any matters caused by or arising from migration of contaminants from property other than the Premises, whether said migration occurred prior to the Closing Date or occurs after the Closing Date; (b) contamination of the Premises that is not subject to Motiva's Corrective Action; and (c) the condition of the

Premises and the equipment as of the Closing Date, it being understood that Purchaser is purchasing the Premises and the equipment on an AS IS BASIS, AND WITHOUT ANY EXPRESS OR IMPLIED WARRANTIES OR REPRESENTATIONS ON THE PART OF Motiva as to what that condition shall be, except as expressly set forth in this Offer and its exhibits. Purchaser's indemnity shall survive the closing.

**11. COMMISSIONS.** The Parties agree that only the following is/are the broker(s) in this transaction and Seller agrees that, at the time of closing, Seller shall pay said broker(s) a commission as follows: Ed Highers/Paul Stanislaus of Grubb & Ellis Company with offices at 200 State Street, 12th Floor, Boston, Massachusetts 02109 to be paid a commission of $46,000.00. Should title not close for any reason, whether by fault of Purchaser or Motiva or any other person, there shall be no commission due and payable to broker who indicates consent to this by signing this instrument in the place provided at the end of this article. Other than as stated above, each party represents it has done nothing that would obligate either party to pay any additional broker's or finder's fee on this transaction, and each party shall indemnify, defend and hold harmless the other party for and from any claim or liability for any such fee. This article shall survive the closing and any termination of this agreement.

AGREED: _____

BROKER: _____

**12. MUTUAL TERMINATION.** By offering to purchase the Premises, Purchaser is also offering to terminate the station lease between Motiva and Purchaser dated April 1, 2002, covering the motor fuel service station at the Premises, and the sales agreement between Motiva and Purchaser dated April 1, 2002, covering the sale and delivery of petroleum products to Purchaser at the Premises (collectively referred to herein as "Facility Agreements") and the relationships thereunder as contemplated by the Petroleum Marketing Practices Act, a summary of which is attached as Exhibit I. Purchaser shall evidence the desire to terminate by signing the Mutual Termination Agreement and Release attached as Exhibit H (the "Mutual Termination"). Regardless of the effective date of the Mutual Termination, Motiva, in its sole discretion, may extend the Facility Agreements and the effective date of the Mutual Termination to facilitate the conveyance hereunder of the Premises for a period or periods ending not later than the Closing Date hereunder. Purchaser releases Motiva from any obligation to sell, deliver or otherwise provide petroleum products to Purchaser at the Premises or any obligation to lease the Premises to Purchaser after the effective date of the Mutual Termination.

**13. ASSIGNMENT.** Purchaser may not assign this Offer and the agreement resulting from acceptance thereof without Motiva's prior written consent, which consent may be withheld by Motiva for any reason whatsoever. **Under no circumstances may Purchaser assign this Offer within fourteen (14) days prior to the Closing Date.** Motiva may assign this Offer and any agreement resulting from the acceptance thereof. Subject to the provisions of this Article, this Offer and the agreement resulting from acceptance thereof shall be binding upon the Parties hereto and their respective heirs, legal representatives, successors and assigns.

**14. CASUALTY.** In the event of substantial loss or damage to the Premises by fire or other casualty prior to delivery of the deed to Purchaser at the closing, each of the

Parties hereto shall have the right to terminate this Offer, without further liability hereunder, upon written notice to that effect to the other. In such event, Motiva shall refund to Purchaser the Earnest Payment; provided, however, should neither party so terminate this Offer, Purchaser shall complete this purchase without any reduction in the Purchase Price. If either party terminates this Offer pursuant to this Article, such termination shall not affect those provisions of this Offer that survive any termination of this Offer.

**15. TITLE**. Motiva shall furnish to Purchaser for review a current title commitment from Escrow Attorney. Within ten business days of the later of Purchaser's receipt of the title commitment or the Return Date, Purchaser shall give written notice to Motiva if the title commitment, or any supplement thereto, reveals any title exception that is unacceptable to Purchaser. Within ten business days of Motiva's receipt of Purchaser's notice that the title commitment is unacceptable, Motiva shall respond to Purchaser in writing, indicating whether Motiva is unable or unwilling to cure or to commence to cure any unacceptable exception. Within five business days of Purchaser's receipt of Motiva's response, Purchaser may terminate this Offer by written notice to Motiva and Adelson Loria & Weisman P. C.. Purchaser's failure to object within the time allowed will constitute a waiver of Purchaser's right to object. Motiva is not required to furnish any affidavit, bond or other assurance or evidence of title to Purchaser or Purchaser's attorney; however, a No Lien Affidavit and a Non-Foreign Entity Affidavit may be provided to title insurer as required. Motiva shall not be required to cure title defects, remove encumbrances, or convey an estate greater than it owned on the Deposit Date. Should a title examination disclose any possible unpaid franchise taxes due the state by Motiva, such taxes shall not be deemed to be an objection to title provided Motiva furnishes Purchaser or Purchaser's title insurer with a letter agreeing to satisfy any delinquency for such taxes.

**16. SURVEY, TITLE INSURANCE, TAXES AND OTHER EXPENSES**. Purchaser is responsible for obtaining, at Purchaser's expense, any survey and title insurance. Purchaser shall, except as otherwise provided herein, promptly furnish to Motiva a copy of any survey, title report or title insurance commitment that Purchaser obtains. At closing, Purchaser shall pay all sales taxes on equipment, recording fees, escrow fees, settlement and closing fees, documentary stamps, realty transfer fees and fees for tax certificates and city, county and state tax stamps. Real and personal property taxes, installments of special assessments for the current year, and water and sewer charges, if any, shall be prorated to the Closing Date.

**17. PURCHASER'S TERMINATION**. In addition to termination rights provided to Purchaser elsewhere in this Offer, Purchaser may, under the following circumstances and as Purchaser's sole and exclusive remedy with respect to this transaction, terminate this Offer and recover any Earnest Payment:

if by the Closing Date Motiva fails or refuses to remove or cure those matters Motiva agreed to remove or cure under Article 15 above; or

if Purchaser's survey reveals a shortage in area of more than 3% of the Premises described in Exhibit A. A shortage of 3% or less shall be regarded as immaterial and shall not be grounds for termination or adjustment of the Purchase Price.

If Purchaser elects to terminate this Offer as provided above, neither party shall have any further obligations or liabilities to the other party resulting from this Offer, with the exception of obligations and liabilities under those provisions of this Offer that survive any termination of this Offer. If Purchaser elects not to terminate this Offer as provided above, Purchaser shall proceed to closing with no reduction of the Purchase Price.

### 18. PURCHASER'S DEFAULT.

**Immediate Termination**. If Purchaser fails to pay the balance of the Purchase Price when and as required, or refuses at the time of closing to accept a deed drawn in accordance with this Offer, or assigns or attempts to assign all or any part of this Offer or the Agreement resulting from acceptance thereof except as provided in Article 13, or fails to close as of the date specified under Article 5 hereof, such shall be an event of default and a breach of this Offer, and Motiva may terminate this Offer, without any demand to Purchaser, further notice or opportunity to cure, and retain the Earnest Payment made hereunder as liquidated damages, which right shall survive the termination of this Offer.

**Termination after Notice**. Excluding Purchaser's acts or omissions referenced above, for which Motiva may immediately terminate this Offer, if Purchaser fails to perform any of Purchaser's obligations under this Offer or otherwise breaches this Offer, such nonperformance or breach shall be an event of default and a breach of this Offer. Unless Purchaser cures such nonperformance or breach within seven (7) days from the date of Motiva's notice informing Purchaser of the nonperformance or breach, Motiva may terminate this Offer and retain the Earnest Payment made hereunder as liquidated damages, which right shall survive the termination of this Offer.

**Motiva's Damages**. The Parties hereto acknowledge that it is impossible to more precisely estimate the damages to be suffered by Motiva upon Purchaser's nonperformance or breach of this Offer, and the Parties expressly acknowledge that retention of the Earnest Payment is intended not as a penalty but as full liquidated damages. Motiva's right to retain the Earnest Payment as full liquidated damages is Motiva's sole and exclusive remedy in the event of nonperformance or breach of this Offer by Purchaser and shall survive the termination of this Offer; and in consideration of Motiva's retention of the Earnest Payment, Motiva hereby waives and releases any right to (and hereby covenants that it shall not) (a) sue Purchaser for specific performance of this Offer or (b) claim that Motiva's actual damages exceed the Earnest Payment. In the event the sale and purchase contemplated by this Offer is not consummated because of Purchaser's nonperformance or breach of this Offer, Purchaser hereby waives and releases any right to (and hereby covenants that it shall not) sue Motiva to recover the Earnest Payment or any part thereof on the ground that it is unreasonable in amount or that its retention by Motiva is a penalty and not agreed upon as reasonable liquidated damages. Regardless of the foregoing, the obligations and liabilities under those provisions of this Offer that survive any termination of this Offer also survive any nonperformance or breach of this Offer by Purchaser.

### 19. MOTIVA'S DEFAULT. If Purchaser is not in default and Motiva fails to perform any of Motiva's obligations under this Offer, excluding those provisions under Article 15 above or fails to convey title to the Premises on the Closing Date as

hereinbefore provided, or otherwise breaches this Offer, such nonperformance or breach by Motiva shall be an event of default and a breach of this Offer. Unless Motiva cures such nonperformance or breach within seven (7) days from Motiva's receipt of Purchaser's notice informing Motiva of the nonperformance or breach, Purchaser may terminate this Offer, whereupon Motiva shall pay Purchaser $50,000.00 as liquidated damages, and neither party shall have any further obligations or liabilities to the other resulting from this Offer, with the exception of obligations and liabilities under those provisions of this Offer that survive any termination of this Offer. In the event the sale and purchase contemplated by this Offer is not consummated because of Motiva's nonperformance or breach of this Offer, Purchaser agrees that Purchaser's sole remedy shall be the refund of Purchaser's Earnest Payment and the liquidated damages referenced herein, and Purchaser hereby waives and releases any right to (and hereby covenants that it shall not) (a) sue Motiva for specific performance of this Offer or (b) claim that Purchaser's actual damages exceed the refund of the Earnest Payment and the liquidated damages amount.

    **20. NOTICES**. Except as otherwise provided, any notice required hereunder shall be delivered either by personal delivery or by depositing it in the mail, certified or registered, or with an air courier, charges prepaid, with confirmation of delivery requested, addressed to the respective parties at:

| To Motiva: | MOTIVA ENTERPRISES LLC |
| | 12700 Northborough, Ste. 100 |
| | Attn: Property & Planning |
| | Houston, Texas 77067 |
| | Phone: 281-874-7000 |
| | Fax: 281-874-2294 |

To Motiva:              MOTIVA ENTERPRISES LLC
                        12700 Northborough, Ste. 100
                        Attn: Property & Planning
                        Houston, Texas 77067
                        Phone: 281-874-7000
                        Fax: 281-874-2294

To Real Estate Consultant:  Steve Santoro
                        PMB 405, 5 Manmar Dr.
                        Plainville, Massachusetts 02762
                        Phone: (508) 698-9627
                        Fax: (508) 698-9628
                        E-mail: SLSantoro@ShellOPUS.com

To Purchaser:           Patra, LLC
                        1241 Boylston Street
                        Boston, Massachusetts 02215-3501
                        Phone: 617-247-7905
                        Fax: 617-536-6636

Purchaser's Attorney:   Robert W. Levy, Esquire
Law Firm (if applicable):  Eckert Seamans
                        One International Place, 18th Floor
                        Boston, Massachusetts 02110-2602
                        Phone: 617-342-6832
                        Fax: 617-342-6899
                        E-mail: rlevy@eckertseamans.com

**21. SECTION 1031 EXCHANGE**.

**Like Kind Exchange**. Motiva and Purchaser agree that Motiva or Purchaser may elect to exchange its ownership interest in the Premises for one or more properties of like kind, or an interest therein, as defined in Section 1031 of the Internal Revenue Code 1986, as amended. Any such election by Motiva or Purchaser shall be made no later than fourteen (14) days prior to the Closing Date as provided for herein. Upon giving notice of Motiva's or Purchaser's election to exchange, Motiva or Purchaser shall be entitled, in its sole discretion, to transfer its ownership interest in the Premises to an intermediary party at the closing, who shall convey such ownership interest to Motiva or Purchaser in order that Motiva or Purchaser may complete a like-kind exchange as provided in Section 1031 of the Internal Revenue Code, as amended. In the event Motiva or Purchaser elects to utilize a 1031 Exchange, the Purchase Price shall be payable by cashier's check or wire transfer at the time of the closing. Should either party bear any costs and fees with respect to the other party's 1031 exchange(s), then the party initiating the 1031 exchange(s) shall reimburse the other party for all reasonable costs and fees incurred.

**1031 Documents**. Motiva and Purchaser agree to execute such agreements and other documents as may be necessary to complete and otherwise effectuate the like-kind exchange of properties in accordance with Section 1031 of the Internal Revenue Code of 1986, as amended.

**22. MOTIVA'S AFFILIATES**. Throughout this Offer, the attached exhibits and any amendments or supplements thereto, the reference to "affiliates" of Motiva means entities directly or indirectly owned, in whole or in part, by Motiva or directly or indirectly having any ownership interest in Motiva, or with respect to those entities having any ownership interest in Motiva, any entities they own, directly or indirectly, in whole or in part.

**23. EXHIBITS**. All exhibits to this Offer are incorporated herein by reference and shall be of the same force and effect as if set forth in full herein. In the event that the terms of any exhibit conflict with the terms set forth in this Offer, the provisions of this Offer shall prevail.

**24. ADDENDUMS**. All addendums to this Offer are incorporated herein by reference and shall be of the same force and effect as if set forth in full herein. THIS OFFER SHALL NOT BECOME ENFORCEABLE UNLESS AND UNTIL ALL REQUIRED ADDENDUMS HAVE BEEN FULLY EXECUTED BY THE PARTIES. In the event that any terms of any addendum conflict with the terms set forth in this Offer, the provisions of the addendum shall prevail.

**25. ENTIRETY**. This Offer and the attached addendum comprises the entire agreement, and merges and supersedes all prior representations and understandings between Motiva and Purchaser concerning the subject matter and consideration hereof.

**26. COUNTERPARTS**. This Offer may be executed in counterparts, each of which shall have the force and effect of an original.

**27. PURCHASER ACKNOWLEDGEMENTS.** Purchaser acknowledges and agrees:

This sale is a cash sale and is not subject to any financing contingency. As such,

if Purchaser fails to close on the Closing Date due to a lack of financing, Purchaser shall be in default and Motiva may, but is not obligated to, terminate this Offer and retain the Earnest Payment made hereunder as liquidated damages; and

Motiva's performance of this Offer shall not be conditioned on Motiva providing any environmental indemnities not expressly stated in this Offer or its exhibits, including, but not limited to, the terms of any indemnities that may be requested by Purchaser to secure lender financing guaranteed by the U.S. Small Business Administration.

Except as otherwise provided, Purchaser may not delay the Closing Date or terminate this Offer once the date to exercise the right to terminate this Offer pursuant to Article 0 has passed.

Purchaser may not delay the Closing Date or terminate this Offer even if, prior to closing, the Premises has not received a closure letter or other determination by the Agency that no further action is required by Motiva at the Premises.

Motiva may require access to the Premises prior to the Closing Date.

PURCHASER CONFIRMS ITS OFFER TO THESE ACKNOWLEDGEMENTS OF THIS ARTICLE BY INITIALING WHERE INDICATED BELOW.

_IG_

Purchaser's Initials

PATRA

~~PRATA~~, LLC                                         **MOTIVA ENTERPRISES LLC**

By: _Gianakopoulos_                          By: _____

Name: _Ilias Gianakopoulos_               Name: _____

Title: _Manager_                                   Title: _____

Date: _October 11, 2004_                     Date: _____

Tax ID: _04-3532221_                           Tax ID: _76-0262490_

Escrow Attorney, on _____, _____, accepts this Offer and the escrow agency hereby created, and agrees to act in accordance with the instructions herein contained; subject, however, to the condition that Escrow Attorney shall incur no liability to either Motiva or Purchaser on account of any action by Escrow Attorney in good faith reliance on any notice properly given hereunder, or on any written waiver, consent, receipt, or other instrument executed by the proper party or parties.

ESCROW ATTORNEY acknowledges receipt of $230,000 (10% of the Purchase Price) as the Earnest Payment in the form of a wire/cashier's check/check representing the Earnest Payment being deposited pursuant to the attached Offer. Escrow Attorney (i) is not a party to the Offer, (ii) has no liability on a check until the check has cleared, (iii) shall not be liable for any losses of escrow funds caused by failure of any banking institution in which such funds have been deposited, and (iv) shall not be liable for any interest or other charge on the Earnest Payment and shall be under no duty to invest or re-invest funds held by it at any time, unless so instructed in separate escrow instructions. Distribution of funds by Escrow Attorney will only be in accordance with written instructions received from both purchaser and seller.

**ADELSON LORIA & WEISMAN P. C.**

By: _____

Name: _____

Title: _____

Date: _____

Escrow Attorney's Address:

One International Place, 11th Floor
Boston, Massachusetts 02110
Phone #:    617-330-1625
Fax #:      617-330-1642
E-mail:     mloria@alwlaw.com